UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| JODIE TOENGES ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4:12 CV 997 DDN |
| ) | |
| CAROLYN W. COLVIN,[1] ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the applications of plaintiff Jodie Toenges for disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401, et seq., and for supplemental security income under Title XVI of that Act, 42 U.S.C. §§ 1381, et seq. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the decision of the Administrative Law Judge is affirmed.

## I. BACKGROUND

Plaintiff Jodie Toenges, born July 13, 1984, filed applications for Title II and Title XVI benefits on March 26, 2010. (Tr. 95-105.) She alleged an onset date of disability of April 7, 2007, due to depression, learning disability, and speech disorder. (Tr. 156-57.)

---

[1] On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security. The Court hereby substitutes Carolyn W. Colvin as defendant in her official capacity. Fed. R. Civ. P. 25(d).

Plaintiff's application was denied initially on July 12, 2010, and she requested a hearing before an ALJ. (Tr. 43-49.)

On January 24, 2011, following a hearing, the ALJ found plaintiff not disabled. (Tr. 11-17.) On April 10, 2012, the Appeals Council denied plaintiff's request for review. (Tr. 1-3.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. MEDICAL HISTORY

On March 17, 2000, the Special School District of St. Louis County continued plaintiff in an individual education program for speech therapy. On March 17, 2001, the school district determined that plaintiff met her individual education programs goals and that she no longer required special education services. (Tr. 120-37.)

On April 7, 2007, plaintiff arrived at the emergency room. Plaintiff attempted to commit suicide by consuming forty tablets of extra strength Tylenol. She reported increased depression, loss of interest, poor energy, sleep and appetite, and feelings of hopelessness and helplessness. She reported stress due to her finances, housing, and domestic issues. Asif Habib, M.D., noted plaintiff's history of depression and previous psychiatric treatment. Dr. Habib diagnosed plaintiff with recurrent major depression without psychotic feature and assessed her GAF score at 10.[2] He prescribed Celexa.[3] Moyosore Onifade, M.D., discharged plaintiff on April 9, 2007. (Tr. 172-95.)

---

[2] A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worst of the two components.

A GAF score from 1-10 represents persistent danger of severely hurting self or others (e.g. recurrent violence), or persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 32–34 (4th ed.2000). ("DSM-IV-TR").

[3] Celexa is used to treat depression. WebMD, http://www.webmd.com/drugs (last visited on September 5, 2013).

On December 5, 2009, at age 24 plaintiff arrived at the emergency room due to depression, lack of appetite, insomnia, and vague suicidal thoughts but did not intend or attempt to commit suicide on this occasion. She reported stress due to sexual abuse as a child, various domestic issues, and housing. Earlier that year, she stopped taking Celexa because it caused drowsiness that interfered with the care of her child. Brenda Ray-Parrish, RN, described plaintiff as calm, cooperative, and sad but not crying. Plaintiff received a diagnosis of depression and a prescription for Celexa. (Tr. 218-29.)

On June 8, 2010, David Peaco, Ph.D., submitted a psychological evaluation of plaintiff. Plaintiff completed the tenth grade and received special education for speech and learning problems. She last worked in a restaurant in September 2009 but left after domestic issues motivated her to move. She began mental health treatment in 2005 and had since taken psychotropic medications intermittently. In 2007, she was hospitalized for mental health problems following a suicide attempt. She resided with her three children, her boyfriend, and her brother. Her stress resulted primarily from finances, conflict with her boyfriend, and the health of her relative and friend. She reported that people often remark on her depression, lack of enthusiasm, and self-esteem. She also reported suffering occasional periods of anxiety manifested by restlessness, shortness of breath, and racing heartbeat. During the course of her day, she cares for herself, her children, and home. She had mild phonological problems. (Tr. 203-04.)

Dr. Peaco found plaintiff's fund of general information above average, her ability to respond to social comprehension questions below average, and her vocabulary skills and overall level of intellectual functioning average. He diagnosed phonological disorder, recurrent and mild major depression, and adjustment disorder with anxiety. He assessed a GAF score of 70.[4] Dr. Peaco additionally found plaintiff able to understand and remember simple instructions. He found her ability to concentrate and capacity to

---

[4] A GAF score from 61-70 represents some mild symptoms (such as depressed mood and mild insomnia), or some difficulty in social, occupational, or school functioning (such as occasional truancy or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. DSM-IV-TR at 32–34.

function effectively mildly impaired due to depression, anxiety, and lack of job skills. He also found her social functioning and persistence in completing tasks unimpaired. (Tr. 204.)

On July 12, 2010, Aine Kresheck submitted a Psychiatric Review Technique for regarding plaintiff. She noted plaintiff's diagnoses of major depressive disorder and adjustment disorder with anxiety. She found plaintiff's impairments not severe. She also found that plaintiff suffered mild limitations with social functioning. (Tr. 207-17.)

On July 13, 2010, plaintiff met with Muhammad Sameer Arain, M.D., and complained of depression and inability to sleep. Plaintiff reported the following. She suffers increased depression, anhedonia, low energy, and lack of appetite. Domestic and financial issues occasionally cause anxiety. She cries and experiences guilt due to her mother's criticism. She received counseling at a young age due to sexual and physical abuse. Her history of abuse also cause nightmares and anxiety attacks. She first received medication for depression and anxiety in 2002. In 2007, she attempted suicide. She has not taken medication for a few months. She resides with her boyfriend and three children. She is unemployed and seeking her GED. Dr. Arain diagnosed plaintiff with moderate major depressive disorder and posttraumatic stress disorder (PTSD). He prescribed Celexa and Lunesta.[5] (Tr. 232-35.)

On August 2, 2010, plaintiff reported sleeping well and good mood. She rated her depression as seven of ten and attributed it to stress. Dr. Arain increased her Celexa dosage. (Tr. 236-37.)

On August 31, 2010, plaintiff reported better mood, improved depression, and sleeping well. She also reported the death of her grandmother and her search for employment. (Tr. 238-39.)

---

[5] Lunesta is used to treat sleep problems, including insomnia. WebMD, http://www.webmd.com/drugs (last visited on September 5, 2013).

On October 5, 2010, plaintiff reported insomnia and stress due to her employment search and finances. Dr. Arain discontinued Lunesta and prescribed Trazodone.[6] (Tr. 240-41.)

On November 2, 2010, plaintiff reported sleeping well, no anxiety, and improved mood. Dr. Arain discontinued Celexa and prescribed Lexapro.[7] (Tr. 242-43.)

On November 30, 2010, Dr. Arain completed a Medical Assessment of Ability To Do Work-Related Activities (Mental) form regarding plaintiff. He listed plaintiff's diagnoses as major depressive disorder and post traumatic stress disorder. He found plaintiff's ability to follow work rules and relate to co-workers good and further found fair plaintiff's ability to deal with the public, use judgment, interact with supervisors, deal with work stresses, function independently, and maintain attention and concentration. He found to be good plaintiff's ability to understand, remember, and carry out complex instructions and her ability to understand, remember, and carry out detailed, but not complex instructions. He also found to be very good or unlimited plaintiff's ability to understand, remember, and carry out simple instructions. He found plaintiff's ability to maintain personal appearance good, and her ability to behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability fair. Additionally, Dr. Arain described plaintiff's prognosis as fair and found her capable of managing benefits. (Tr. 230-31.)

**Testimony at the Hearing**

The ALJ conducted a hearing on December 17, 2010. (Tr. 21-40.) Plaintiff testified to the following. She is a single mother with custody of her three children. She lives with her two youngest children and their father in a duplex rented with the assistance

---

[6] Trazodone is used to treat depression. WebMD, http://www.webmd.com/drugs (last visited on September 5, 2013).

[7] Lexapro is an antidepressant used to treat depression and anxiety. WebMD, http://www.webmd.com/drugs (last visited on September 5, 2013).

of housing subsidies. She has a driver's license but has not driven for eight months due to lack of a car. Although her children's father owns a car, he does not permit her to drive due to her lack of insurance coverage. Her mother drove her to the hearing. (Tr. 26-28.)

She completed the tenth grade and studied auto mechanics her sophomore year at West Tech High School. Since April 2007, she has not held a job for longer than one month. She quit her job in April 2007 after only a few days due to employment discrimination. She remained unemployed until 2009 when she worked at a Taco Bell for about three weeks. In 2010, she cleaned rooms at a Super Eight motel for about a month. (Tr. 28-29.)

She and her children receive Medicaid and food stamps. Although her eldest child's father owes her about $100 to $150 per month for child support, he has missed several payments and forces her to seek payments from his employer.

In 2006, she worked as an nurse's aide for the Warrenton Manor. Her duties varied but consisted of helping residents out of bed, dressing, restroom and shower assistance, and feeding. Her employer terminated her because she forgot to help a resident during a double shift due to fatigue. The job required her to lift over one hundred pounds. In 2004, she worked as a customer service sales representative for Americall Group, a telemarketing company. Her duties consisted of answering telephone calls and recording information. She quit due to moving. (Tr. 29-31.)

She could not perform her previous work for a full eight hour day due to stress. She does not like to leave the house and only leaves to shop for groceries. She finds being around people difficult and often desires to be locked away. In 2003 or 2004, she passed a check before depositing her paycheck and paid restitution. (Tr. 31-33.)

Plaintiff has experienced difficulty sleeping for a few years, and her medications do not always help. Plaintiff goes to bed around 10 p.m. and gets about three hours of sleep per night. She wakes her oldest child for school between 6:00 and 6:30 a.m. and returns to bed. When her younger children awaken, she dresses and feeds them and watches

television with them. They usually nap for a few hours. She cooks dinner. When her children's father or neighbor are present, she lies down. (Tr. 33-34.)

Plaintiff rates her energy level on most days as two or three of ten. Some days are worse for her than others. On bad days, plaintiff prefers sleeping and staying in bed. On good days, she performs housework and shops at the grocery store. On bad days, she cries all day for no discernible reasons and lacks appetite. She receives help with her children from their father and her neighbor during her bad days. She is currently taking Lexapro for her depression. (Tr. 34-36.)

She was hospitalized in 2007 after attempting suicide by consuming a bottle of Tylenol. Preparing for Easter, reconnecting with her eldest child's father, and her newborn overwhelmed her. She received care at Christian Northeast Hospital for three days. She experienced depression early in her life due to sexual, physical, and mental abuse from her stepfather, exposure to a sexually transmitted disease at age six or seven, and meeting her biological father at age thirteen only to discover that he slept with her sister. Her psychiatrist informed her that the abuse caused her depression, which bearing a child triggered. Her depression continued after her suicide attempt, but she did not seek additional medical care due to uncertainty regarding her insurance coverage. Her depression has improved since 2007. In 2007, her depression caused her to lock herself in her room and refuse to leave, eat, and launder. Her oldest son prepared himself for school, and her father tended to her daughter. At that time, she only experienced bad days. (Tr. 36-38.)

Plaintiff has received treatment from Dr. Arain of the Carter Center since July of 2010. Initially, she received treatment once every two weeks but currently attends only once every four weeks. Her visits generally last for five minutes and consist of a few questions and a prescription. She currently seeks additional professional assistance for coping with her past. (Tr. 38-39.)

## III. DECISION OF THE ALJ

On January 24, 2011, the ALJ issued a decision that plaintiff was not disabled. (Tr. 11-17.) At Step One of the prescribed regulatory decision-making scheme,[8] the ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged onset date, April 7, 2007. At Step Two, the ALJ found that plaintiff's medically determinable impairments included major depression and posttraumatic stress disorder but found them not severe. (Tr. 13.)

## IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. § 404.1520(a)(4); see also Bowen

---
[8] See below for explanation.

v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. 20 C.F.R. § 404.1520(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform his past relevant work (PRW). Id. § 404.1520(a)(4)(iv). The claimant bears the burden of demonstrating she is no longer able to return to his PRW. Pate-Fires, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. Id.; 20 C.F.R. § 404.1520(a)(4)(v).

## V. DISCUSSION

Plaintiff argues that the ALJ erred by failing to properly discuss plaintiff's credibility and by failing to find plaintiff's mental impairments severe.

A. **Credibility**

Plaintiff argues that the ALJ summarily discredited her allegations and failed to discuss the Polaski factors.[9]

To evaluate a claimant's subjective complaints, the ALJ must consider the Polaski factors: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the condition; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions." Wildman v. Astrue, 596 F.3d 959, 968 (8th Cir. 2010). The ALJ must acknowledge and consider these factors but "need not

---

[9] Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (stating factors).

explicitly discuss each Polaski factor." Id. The ALJ may also consider inconsistencies in the record as a whole. Id. "[Courts] defer to an ALJ's credibility finding as long as the ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so." Id.

The ALJ discussed that plaintiff suffered no limitations regarding her daily living activities. Plaintiff stated that her mental condition does not affect her ability for personal care and that she prepares meals and cleans her house daily, leaves her home by walking or driving about four times per week, shops, pays bills, and converses with her neighbor daily. (Tr. 144-48.) Dr. Peaco noted that plaintiff maintained an active life and independently cared for herself, her children, and home. He further noted that she reported "no real difficulty functioning in her most recent job." (Tr. 204.) Finally, at the hearing, plaintiff testified that she cooks, cleans, and cares for her children. (Tr. 31-34.)

The ALJ also discussed the effectiveness of her medication. "If an impairment can be controlled by treatment or medication, it cannot be considered disabling." Roth v. Shalala, 45 F.3d 279, 282 (8th Cir. 1995). He noted that, after beginning regular mental treatment in July 2010, medication improved plaintiff's mood and difficulty sleeping. (Tr. 232-45.) Prior to that, the ALJ noted, she did not take medication nor seek treatment regularly. (Tr. 174, 218, 233.)

The ALJ also discussed her functional restrictions. He noted that Dr. Arain, her treating psychiatrist, rated all plaintiff's mental abilities fair, good, or very good. (Tr. 230-31.) He also noted that Dr. Peaco similarly found that plaintiff had minor limitations. (Tr. 204.) Further, the ALJ specifically discussed social functioning, concentration, persistence, and pace, and episodes of decompensation. (Tr. 17.)

Contrary to plaintiff's allegations, the ALJ expressly discussed several of the Polaski factors. Further, substantial evidence supports the ALJ's credibility determination.

**B. Severity**

Plaintiff argues that the ALJ erred by finding plaintiff's mental impairments not severe. An impairment or combination of impairments is severe if it significantly limits physical or mental ability to perform basic work activities. 20 C.F.R. § 404.1521(a). Basic work activities are the abilities and aptitudes necessary to do most jobs, including capacities for seeing, hearing, and speaking, understanding, performing, and remembering simple instructions, judgment, responding appropriately to supervision, co-workers and usual work situations, and coping with changes in a routine work setting. 20 C.F.R. § 404.1521(b). For mental impairment evaluations, the ALJ considers the functional areas of daily living activities, social functioning, concentration, persistence, and pace, and episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3). Absent evidence of limited mental ability to perform basic work activities, findings of no or mild limitation and of no episodes of decompensation result in a finding that mental impairments are not severe. 20 C.F.R. § 404.1520a(d)(1).

The ALJ found no limitation regarding plaintiff's daily living activities, which the record supports as set forth above. (Tr. 17.)

The ALJ found no limitation regarding plaintiff's social functioning. (Id.) Dr. Peaco noted that plaintiff enjoys a social life with her family and found her social functioning unimpaired. (Tr. 204.) She also stated that she visits her neighbor daily. (Tr. 148.)

The ALJ found mild limitation regarding plaintiff's concentration, persistence, and pace. (Tr. 17.) Dr. Peaco found her persistence unimpaired and concentration mildly impaired. (Tr. 204.) Further, Dr. Arain found her ability to maintain attention and concentration fair. (Tr. 230.)

The ALJ found that plaintiff suffered no episodes of decompensation since her emergency room visit on April 7, 2007. The record contains no other evidence of episodes of decompensation.

Further, Dr. Arain considered several of plaintiff's abilities to perform basic work activities and rated each ability very good, good or fair. (Tr. 230-31.) Additionally, Dr. Peaco found that "her capacity to deal with the world around her" only mildly impaired. (Tr. 204.)

Regarding the relevant functional areas, the ALJ found either no or mild limitation and of no episodes of decompensation, and substantial evidence supports these findings. The record contains no evidence regarding limited ability to perform basic work activities other than plaintiff's allegations, which the ALJ properly discounted as set forth above. Accordingly, the ALJ did not err by finding plaintiff's mental impairments not severe.

Plaintiff also argues that the ALJ's failure to include a narrative discussion of plaintiff's RFC is reversible error. The RFC assessment must include a narrative discussion regarding the evidence supporting each conclusion. <u>Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims</u>, SSR 96-8P, *6 (1996). However, determinations of disability do not require RFC assessments. The regulations state:

> The sequential evaluation process is a series of five "steps" that we follow in a set order . . . If we can find that you are disabled or not disabled at a step, we make our determination or decision and we do not go on to the next step. If we cannot find that you are disabled or not disabled at a step, we go on to the next step. Before we go from step three to step four, we assess your residual functional capacity.
>
> * * *
>
> At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

20 C.F.R. § 404.1520(a)(4). Here, at Step Two, the ALJ found plaintiff's mental impairments not severe and determined that plaintiff was not disabled. (Tr. 13-17.) Therefore, the ALJ did not err by not including a narrative discussion of RFC.

## VI.  CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed.  An appropriate Judgment Order is issued herewith.


      /S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**


Signed on September 5, 2013.